**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| In re:<br><br>Philip A. LaMantia,<br><br>                          Debtor | Chapter 7<br>Case No. 18-10632 |
| Dane Rasmussen<br>& Brooke Miller,<br><br>                          Plaintiffs<br>  v.<br><br>Philip A. LaMantia,<br><br>                          Defendant | Adv. Proc. No. 19-1002 |

## **MEMORANDUM OF DECISION**

The Plaintiffs entered into a contract with the Defendant, a contractor, for improvements to their home. The Plaintiffs did not receive the benefit of their bargain and they sued him in state court. The Defendant then sought refuge in bankruptcy. The Plaintiffs now ask the Court to deny the Defendant's discharge and to determine that his debt to them is nondischargeable.

The Defendant has moved for judgment on the pleadings under Fed. R. Civ. P. 12(c). That motion will be granted to the extent that the Plaintiffs seek to deny the Defendant a discharge under 11 U.S.C. §§ 727(a)(3) and (a)(5). As to those claims, the Plaintiffs find themselves pushing a square peg at a round hole. They have, however, stated plausible claims to deny the Defendant a discharge under 11 U.S.C. § 727(a)(2)(A) and to obtain a determination of nondischargeability under 11 U.S.C. § 523(a)(6). The Defendant's motion will therefore be denied in part, to permit those claims to proceed.

## ANALYTICAL FRAMEWORK

In most cases, the standard for evaluating a motion under Fed. R. Civ. P. 12(c) mirrors that for evaluating a motion under Fed. R. Civ. P. 12(b)(6). *See* Harvey v. United Techs. (In re Harvey), 388 B.R. 440, 442 (Bankr. D. Me. 2008). To resolve the motion, the Court employs a two-pronged approach, beginning with identifying and disregarding allegations in the complaint that either amount to legal conclusions or merely parrot the elements of a cause of action. Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 12 (1st Cir. 2011). In this first step, factual allegations may also be disregarded if they are so threadbare or speculative that they "fail to cross the line between the conclusory and the factual." Peñalbert-Rosa v. Fortuño-Burset, 631 F.3d 592, 595 (1st Cir. 2011) (quotation marks omitted). In the second step, the Court treats the remaining factual allegations in the complaint as true. Ocasio-Hernández, 640 F.3d at 12. Although generally confined to the pleadings, the Court may supplement the well-pleaded facts by considering documents incorporated into the complaint and facts susceptible to judicial notice. R.G. Fin. Corp. v. Vergara-Nuñez, 446 F.3d 178, 182 (1st Cir. 2006).

In accordance with this framework, the following facts are drawn from the Plaintiffs' First Amended Complaint [Dkt. No. 13] (the "Complaint") and the attached exhibits. The narrative in the Complaint presents one side of the story of the parties' relationship. In reviewing that narrative, certain questions emerge. Those questions are largely immaterial at this juncture, however, because a Rule 12(c) motion tests the sufficiency of the pleadings based on the legal theories invoked, not the general cohesiveness of the story contained in the pleadings. As such, the Court simply recounts the facts alleged in the Complaint, and assumes those facts are true for the purposes of this decision.

**FACTUAL BACKGROUND**

The Plaintiffs needed to expand their home to accommodate a growing family. So, they engaged a reputable and experienced architect who drew up plans for a substantial renovation and expansion of their home. The plans contained all the necessary information for a contractor to provide an estimate for the project based on the specific materials required and the scope of the work. The plans also contained an express caveat that no changes to the plans or the materials were to be made without the architect's consent.

In July 2017, the Plaintiffs met with the Defendant to discuss their needs for construction services. The Defendant represented himself and his company, LaMantia Construction, Inc. ("LCI"), as hardworking, honest, and fair, and expressly represented that he had the skills and competence to undertake the Plaintiffs' project. The Defendant received the architectural plans for the project in order to develop a quote. On July 7, 2017, the Plaintiffs and the Defendant signed a contract for labor and materials for the construction of an addition to and renovations of the Plaintiffs' home. The handwritten contract, on LCI's letterhead, called for LCI to take control of the project contemplated by the architect. The contract detailed the work to be done, required any changes involving extra costs to be made in writing, and set a price of $82,500 for the labor and materials for the project. It also established a schedule of four payments, with the caveat that if materials or other costs were less than anticipated, the final payment might be less than specified or might not be owed at all. The contract stated that LCI would be in control of purchasing most materials, and that any materials ordered would be counted and checked in at the time of arrival. The contract did not state that the Defendant would charge the Plaintiffs more for materials than he was charged. The Plaintiffs paid the Defendant $40,000 when the contract was signed.

The Defendant made a good impression in his first days on the job in mid-July. But as he was doing the groundwork, the Defendant damaged the line connecting the house to the septic system. The damage had to be repaired immediately so that the project could continue. A plan was made to run a new septic line through the broken line and a subcontractor was hired for the task. To prepare for the new line, the Defendant dug up the septic tank. At that point, cracks in the tank were discovered, rendering replacement of the tank necessary to ensure that the new line would work. The plumbing subcontractor was able to replace part of the septic line, but the tank replacement was postponed until mid-August.

On July 31, 2017, the Defendant requested $28,000, stating that the payment was "needed because of the additional cost of replacing the septic system." The Plaintiffs paid the $28,000, as requested. The Defendant assured the Plaintiffs that the project was "still on track as far as the budget," even with the additional cost.

After the subcontractor completed his work in mid-August, the Defendant returned to the job, where he worked for a couple of weeks. During this time, he engaged in site preparation, poured cement for the floor slab, and constructed concrete walls. The architectural plans specified that concrete walls were a critical part of the project, intended to support the renovations and the new construction. The Defendant chose to construct the walls with common concrete cinder block. The use of this material substantially deviated from the material specified in the plans. The Defendant insisted on this deviation, claiming that he had consulted with an "engineering firm" and that he possessed "technical drawings" in support of his decision.

On August 28, 2017, the Defendant submitted an itemized invoice to the Plaintiffs. Concurrently, the Plaintiffs paid the Defendant $14,500, representing the last payment required under the parties' contract. At that time, the Defendant assured the Plaintiffs that the project was

"still on budget," depending on the finishes selected. There were pallets of leftover materials, and the Defendant told the Plaintiffs that these materials would be returned and credited to their invoice. He also told the Plaintiffs that the extra cement blocks would be returned for "safekeeping" pending "future" use in the deck supports.

After the last payment, differences arose between the parties regarding the radiant heat system in the plans. The Defendant questioned the necessity of installing the radiant heat system specified and informed the Plaintiffs that he had "never heard of a space being heated this way." The Plaintiffs believed that the proposed deviation from the plans would be unwise and unworkable and opted not to have the Defendant install the radiant heat system.[1]

At the end of August and beginning of September, preparations were made for the slab-topping concrete pour. On September 11, the Defendant poured 19 cubic yards of concrete for the top slab to start the job. He failed to manage the pour and serious issues arose. He spilled cement into a critical drainage point located in the driveway and made a mess of the pour. He told the Plaintiffs he would return in a week to complete the unfinished slab. But, after that day, the Defendant never returned to complete the job. When he ceased work, the project remained far from completion.

In light of the deviations and delays and the Defendant's apparent lack of reliability, the Plaintiffs began to have doubts about the Defendant's competence and veracity. They tried to contact him about finishing the slab and remediating the damage to the driveway. They left messages at the phone number the Defendant had provided but received no reply. On September 20, the Plaintiffs reached the Defendant, and he informed them that he would return to the job

---

[1] If the contract required installation of a radiant heating system and the parties later agreed that the Defendant would not install that system, it would be reasonable to expect that the contract price may have been adjusted to reflect that agreement. The Complaint does not make any allegations in this respect.

within a week.  On September 27, following the Defendant's failure to return to the jobsite, the Plaintiffs contacted the Defendant on the phone, expressing concerns about his inattention to the job, and demanding that he remedy the situation immediately.  At that point, he told the Plaintiffs he was unsure when he would return.

When the Plaintiffs called the Defendant on October 4, he became verbally abusive and accusatory.  The Plaintiffs were concerned about the status of the project and felt that the Defendant was being dishonest about the job and the invoice he had submitted.  They questioned him about why the invoice reflected overages beyond the additional septic system work.  The Defendant expressed frustration at the Plaintiffs' attempts to hold him accountable.  The Defendant informed the Plaintiffs that they had "a credit" that would be refunded because he would be "abandoning the project."  He then ended the call.  When the Plaintiffs called him back, a calmer discussion ensued.  The Plaintiffs implored the Defendant to clean up the mess and complete the project before the weather turned cold.  Despite their demands, the Defendant refused to commit to a schedule to finish the job.

The Plaintiffs heard nothing from the Defendant for 20 days.  Under the circumstances, they assumed that the Defendant had abandoned the job.  The unfinished construction began leaking, causing distress to the Plaintiffs and damage to their property.  On October 25, 2017, the Plaintiffs texted the Defendant asking to speak about reducing the scope of the project in the hope that he would complete some of the work.  The following day, the Defendant returned to the jobsite to view the leaking concrete structure.  He observed that he "needed to correct it" and he removed some of the framing supporting the structure.  He then dropped out of contact with the Plaintiffs again.

Two weeks later, the Plaintiffs reached the Defendant by phone and again asked him about the schedule for competing the project. The Defendant demanded an additional $57,000 to "finish" the project by fixing the concrete room and building the mudroom and deck. He clarified that the additional funds would not include radiant heat, the opening of two interior walls, kitchen or bathroom flooring, or new bathroom fixtures—all of which had been included in the original contract. Despite his prior assurance, the Defendant informed the Plaintiffs that there was no credit and he refused to return any of the funds paid by the Plaintiffs. The Plaintiffs were shocked at the increased price for less work and questioned the increase. The Defendant replied that the Plaintiffs "had to know that things were over budget," and that the concrete pour had been "tens of thousands over budget." Despite the Plaintiffs' requests, he did not provide any further explanation for the increased price. The Plaintiffs concluded the discussion by asking the Defendant to provide all of the invoices for the materials associated with the project to date. None of the invoices were forthcoming, and the Plaintiffs requested them again the next day. On November 10, the Plaintiffs made another attempt to speak with the Defendant about finishing the job. He agreed to meet with them "within a week" to discuss all issues and review the invoices that he agreed to provide. This November 10 communication was the last the Plaintiffs received from the Defendant.

On November 12, 2017, the Plaintiffs emailed the Defendant again, requesting the invoices along with the engineering data and technical drawings he had cited as a basis to deviate from the architectural plans. They did not receive a response. They made a final attempt to contact the Defendant on November 14 and, again, received no response.

The Plaintiffs then began trying to minimize their damages and assess the project for completion by a different contractor. They also began comparing the costs that the Defendant

claimed on the invoice he had given them with the costs reported by the vendors. Their research revealed that the material costs claimed by the Defendant had been overstated by at least 90% for some materials, and by more than that for others. The demolition waste claimed and invoiced by the Defendant had been inflated by 20 tons. The Defendant had charged them $4,268 for the expense of the "engineering firm" he had cited in support of his decision to use cinder blocks, rather than the materials specified in the plans. Despite requests from the Plaintiffs, the Defendant never produced the "architectural drawings" allegedly created by that firm, and the Plaintiffs were unable to confirm the existence of the firm. In fact, the firm did not exist. The Plaintiffs discovered that the Defendant had converted certain materials they had provided for use on their project to his own uses. They also discovered that unused materials had been returned for a credit that had not been applied to their invoice. The Defendant pocketed the refund—approximately $6,500. Ultimately, the Plaintiffs determined that there had been a difference of at least $33,750 between the invoiced costs and the actual costs.

      The Plaintiffs retained an engineering firm to conduct a site inspection and evaluation of the Defendant's unfinished work. In its report, the firm concluded that there were "several areas" of workmanship that failed to meet "generally accepted construction practices" and that some of the construction, "most notably" the foundation work, "did not meet plans and contract specifications." Later, the Plaintiffs' architect conducted another inspection and submitted a letter detailing his findings. The architect opined that the Defendant's work was "unsatisfactory" and suitable only for demolition. The Plaintiffs engaged a contractor who demolished the Defendant's work at a cost of $9,181. After the demolition, the contractor gave the Plaintiffs a report in which he pronounced the Defendant's work "excessive and non-conforming[,]" grossly

negligent, and "not providing a good product[.]" The contractor also provided an estimate of $88,385 to complete the project.

In December 2017, Plaintiffs discovered that the heat and water in their home were no longer working. They secured a plumber to repair the system. An investigation revealed that the problem had been caused by the Defendant's failure to protect a section of pipe he had exposed while preparing for construction. For the remainder of the heating season, the Plaintiffs' house had to be kept at 70 degrees to prevent the exposed pipe from freezing. The extra cost of maintaining this temperature for the winter was estimated to be $275 to $300 per month. Further remediation of the plumbing will be required when the renovation and expansion project resumes in the future.

In February 2018, the Plaintiffs commenced a civil action against the Defendant for fraud, conversion, unjust enrichment, violations of Maine's Home Construction Contract Practices Act, violations of Maine's Unfair Trade Practices Act, breach of contract, breach of warranty, breach of fitness, and negligence. In that suit, the Plaintiffs were granted an ex parte attachment on the Defendant's assets. The Defendant learned of that attachment before it was served and moved assets out of his bank accounts.[2] In May 2018, the Defendant began a chapter 13 case. Three months later, the Court dismissed that case on the Defendant's motion. On

---

[2] The Plaintiffs make this allegation "upon information and belief." The Defendant attacks this allegation, and others made "upon information and belief," as bald-faced, relying solely on speculation, and lacking reference to "objective facts." [Dkt. No. 21-1 at 2 n.1, 6.] The Court has reviewed the allegations made "upon information in belief" in the same manner as all other allegations in the Complaint, disregarding them if they are conclusory, and otherwise crediting them as true for the purposes of this decision. *See* Lycoming Engines v. Superior Air Parts, Inc. (In re Superior Air Parts, Inc.), 486 B.R. 728, 740 (Bankr. N.D. Tex. 2012) ("Allegations pled on 'information and belief' should be reviewed in the same way as all factual allegations in a complaint—that is, the court should review them under Twombly's 12(b)(6) formulation requiring sufficient facts pled to make a claim plausible.").

October 30, 2018, before the entry of judgment in the civil action, the Defendant began the chapter 7 case underlying this adversary proceeding.

## LEGAL ANALYSIS

Because a motion for judgment on the pleadings "calls for an assessment of the merits of the case at an embryonic stage," the Court views the universe of facts in the light most favorable to the nonmovants and draws all reasonable inferences in their favor. Vergara-Nuñez, 446 F.3d at 182. The facts, so viewed, must be measured against the rubric of plausibility—not probability and not possibility. See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556-57 (2007). A complaint states a plausible claim for relief if the well-pleaded factual allegations permit the "reasonable inference that the defendant is liable for the misconduct alleged." See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Here, the Complaint contains four counts, each of which is addressed in turn.

### I. Count I: Objection to Discharge Under 11 U.S.C. § 727(a)(2)(A)

The Plaintiffs first invoke section 727(a)(2)(A), which provides that the Court may not grant the debtor a discharge if:

> the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—
>
> (A) property of the debtor, within one year before the date of the filing of the petition[.]

11 U.S.C. § 727(a)(2)(A). In Count I, the Plaintiffs allege that the Defendant should be denied a discharge under section 727(a)(2)(A) because, when he contracted with them and took their money, he intended to hinder, delay, or defraud them. These allegations must be disregarded because they do little more than parrot the text of the statute. Even if these allegations could

- 10 -

properly be credited as true, they would fail to state a plausible claim.  The Plaintiffs theorize that the Defendant made a transfer with the intent to hinder, delay, or defraud them when he took their money and did not provide the agreed-upon construction services in a competent manner.  This theory does not work because it incorrectly focuses on what the Defendant received and how he received it.  Section 727(a)(2)(A) turns, instead, on what the debtor gave away, when he gave it away, and the circumstances under which he gave it away.

Although the Plaintiffs do not expressly incorporate the other paragraphs of the Complaint into their prayer for relief in Count I (or any of the other counts, for that matter), the Court assumes this incorporation was intended and reviews the rest of the Complaint for allegations that might satisfy the elements of the statutes the Plaintiffs invoke.

The Plaintiffs allege that the Defendant learned of their attachment in the civil action before that attachment was served and then moved assets out of his bank accounts, presumably to avoid attachment.  The alleged act of moving assets out of bank accounts occurred within a year of October 30, 2018.  The act of moving funds out of bank accounts may qualify as a transfer of the Defendant's property.  *See* Groman v. Watman (In re Watman), 301 F.3d 3, 10 (1st Cir. 2002) (stating that "the definition of transfer under 11 U.S.C. § 101(54) applies in the context of § 727"); 11 U.S.C. § 101(54) (defining "transfer" broadly); S. Rep. 95-989, at 27 (1978) (explaining that "any transfer of an interest in property is a transfer, including a transfer of possession, custody, or control even if there is no transfer of title, because possession, custody, and control are interests in property").  *But cf.* Furr v. TD Bank, N.A., No. 18-CV-81390-KAM, 2019 WL 4621627, at *2 (S.D. Fla. Sept. 24, 2019) ("When a debtor endorses a check for deposit or directs a wire by a third party into its own unrestricted bank account, the debtor has not 'disposed' or 'parted with' any interest in the right to payment or credit represented by the

check or wire, and, therefore, no 'transfer' has occurred.").[3] The circumstances of the alleged conduct also render it reasonably likely that the Defendant harbored the intent to hinder, delay, or defraud his advancing creditors.  In short, the Plaintiffs do just enough to state a claim to deny the Defendant a discharge under section 727(a)(2)(A).  The pool of allegations germane to this issue is on the shallow side, but the pleading, as a whole, permits the reasonable inference that the Defendant engaged in conduct proscribed by section 727(a)(2)(A).  Accordingly, the Defendant's motion for judgment on the pleadings will be denied as to Count I.

## II.     Count II: Objection to Discharge Under 11 U.S.C. § 727(a)(3)

In Count II, the Plaintiffs assert that the Defendant's discharge should be denied under section 727(a)(3) because, when he took their money, he "concealed, destroyed, mutilated, falsified, or failed to keep or preserve recorded information, including, but not limited to, documentation from which the Defendant's actual financial transactions and condition might be ascertained."  Section 727(a)(3) states that the Court may not grant the debtor a discharge if:

> the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case[.]

11 U.S.C. § 727(a)(3).  The allegations in Count II do little more than parrot the elements of the statute.  As such, they are not accepted as true.

---

[3] The Complaint does not identify the bank accounts in question, how much money was transferred, or where the money was transferred.  At oral argument, the Plaintiffs' counsel provided no details about the transfer; instead, he asserted only that there were no funds in the account when the attachment was served.  Although the Court's disposition of the Rule 12(c) motion does not depend on statements at oral argument, this particular statement gave the Court pause.  The mere fact that there were no funds in the Defendant's bank account does not, by itself, suggest that the Defendant made a transfer with actual intent to hinder, delay, or defraud the Plaintiffs.  The statement by counsel, combined with the lack of specificity regarding the transfer in the Complaint, leaves the Court to speculate about whether this particular allegation satisfies the requirements of Fed. R. Bankr. P. 9011(b).  That is a question to be addressed, if at all, another day.

The Plaintiffs make several allegations that might relate to—but ultimately do not state—a claim under section 727(a)(3). First, they allege that the Defendant fabricated or concealed unspecified paperwork associated with unspecified assets upon learning of the attachment issued in the civil action filed in 2018. This allegation is too vague to carry Count II past the Defendant's motion, as it would require the Defendant to speculate as to the action undertaken, the paperwork affected, and the associated assets. *See* Butler v. Deutsche Bank Trust Co. Americas, 748 F.3d 28, 32 (1st Cir. 2014) (noting that, at the 12(b)(6) stage, "bald assertions" are properly disregarded); Peñalbert-Rosa, 631 F.3d at 595 ("some allegations, while not stating ultimate legal conclusions, are nevertheless so threadbare or speculative" that they do not cross the line separating the conclusory from the factual).

Second, the Plaintiffs allege that the Defendant falsified his bankruptcy paperwork. This allegation is also disregarded because it is not germane to a claim under section 727(a)(3) but instead relates to 11 U.S.C. § 727(a)(4)—a statute the Plaintiffs have not invoked. *See* Reperex, Inc. v. May (In re May), 579 B.R. 568, 597-98 (Bankr. D. Utah 2017) ("If falsification of bankruptcy schedules were actionable under § 727(a)(3), that would largely turn § 727(a)(4)(A) into a dead letter[.]").

Third, the Plaintiffs allege that the Defendant failed to produce copies of vendor invoices related to the work he performed for them, despite their requests and demands.[4] They also allege that they obtained information from vendors that showed that the Defendant inflated the cost of the materials that he used on the Plaintiffs' job and overcharged them on the invoice that he

---

[4] The parties have, for the most part, treated the Defendant and LCI as one and the same. They made no arguments, for example, about whether the Defendant has, or could have, liability for breach of contract when the contract appears to have been made by the Plaintiffs and LCI. For the purposes of this decision, the Court assumes, without deciding, that the Defendant could be held justly accountable for LCI's recordkeeping practices, however meticulous or lacking.

submitted to them. From these allegations, one could possibly infer that the Defendant destroyed or failed to keep copies of vendor invoices from which the Plaintiffs could discern an accurate picture of the transactions undertaken in furtherance of their construction project. But one could also surmise that the Defendant kept meticulous records and simply refused to produce copies of the vendor invoices when his relationship with the Plaintiffs hit the rocks. Ultimately, the inflated invoice submitted to the Plaintiffs before the petition, and the Defendant's failure to substantiate that invoice by producing copies of vendor invoices, might affect the dischargeability of the debt to the Plaintiffs under a provision like 11 U.S.C. § 523(a)(2)(A), which was not invoked in the Complaint. But the inflated invoice does not tend to establish that the Defendant concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information from which his financial condition might be ascertained in connection with this case. *See* Itria Ventures LLC v. Chadha (In re Chadha), 598 B.R. 710, 719 (Bankr. E.D.N.Y. 2019) (holding section 727(a)(3) inapplicable where complaint did not allege that the debtor failed to keep or preserve recorded information such that the debtor's financial circumstances could not be ascertained postpetition, but instead alleged that the debtor misrepresented the financial health of his restaurants before the petition date); Peoples Thrift Savs. Bank v. Larrieu (In re Larrieu), 230 B.R. 256, 269 (Bankr. E.D. Pa. 1999) (concluding that the debtor's prepetition submission of false financial statements and tax returns might relate to the dischargeability of a debt but did not amount to a failure to supply information in connection with the case and was not material to a claim under section 727(a)(3)).

    A successful claim under section 727(a)(3) is generally predicated on something more than an allegation that a single financial record was somehow falsified, or that certain records relating to a single aspect of the debtor's financial affairs were not produced upon prepetition

request.  *Compare* Agai v. Mihalatos (In re Mihalatos), 527 B.R. 55, 67 (Bankr. E.D.N.Y. 2015) (concluding that, by establishing that debtor failed to produce one specific bank statement, plaintiffs did not meet burden under section 727(a)(3)) *with* Desiderio v. Devani (In re Devani), 535 B.R. 26, 33 (Bankr. E.D.N.Y. 2015) (concluding that plaintiffs met burden under section 727(a)(3) by establishing that debtor failed to provide any financial records other than a single, unsigned tax return that lacked supporting documentation).  There is some authority that might support denying a discharge to a contractor under section 727(a)(3) for falsifying invoices submitted to customers in order to accelerate payments.  *See* Phillips v. Bourget (In re Bourget), 176 B.R. 25, 27-28 (Bankr. C.D. Cal. 1994).  But that authority is neither binding nor persuasive.  A motion to dismiss a section 727(a)(3) claim is properly denied where the complaint specifically alleges that (a) the debtor failed to maintain any accounting or financial records and (b) that the failure made it impossible to determine the debtor's financial condition, as in Aspire Federal Credit Union v. Robinson (In re Robinson), 595 B.R. 148, 158-59 (Bankr. S.D.N.Y. 2019).  Here, the only alleged recordkeeping irregularities or deficiencies relate to a single, prepetition invoice and information that might substantiate or undermine that invoice.

The Plaintiffs fail to state a claim for relief under section 727(a)(3).  For this reason, the Defendant's motion for judgment on the pleadings will be granted with respect to Count II.

### III.     Count III: Objection to Discharge Under 11 U.S.C. § 727(a)(5)

In Count III, the Plaintiffs assert that the Defendant's discharge should be denied under section 727(a)(5), which precludes the entry of a discharge if "the debtor has failed to explain satisfactorily . . . any loss of assets or deficiency of assets to meet the debtor's liabilities[.]"  11 U.S.C. § 727(a)(5).  To state a claim for relief under section 727(a)(5), a plaintiff must identify the assets "in question by appropriate allegations in the complaint and [show] that the debtor at

one time had the assets but they are no longer available for the debtor's creditors." Ehle v. Brien (In re Brien), 208 B.R. 255, 258 (B.A.P. 1st Cir. 1997) (quotation marks omitted). In this proceeding, the Plaintiffs fall short of this pleading threshold. In Count III, they copy the text of the statute nearly verbatim. Elsewhere, they allege that the Defendant misrepresented encumbrances on unspecified real and personal property and failed to disclose unspecified bank accounts and business endeavors in his bankruptcy filings. They also allege that the "Defendant and his agents have engineered and hold a constructive interest in real property for purposes of concealing the true nature of the interest and Defendant's assets therein from the Court and Creditors." These allegations fail to carry Count III past the Defendant's motion for multiple reasons. First, the allegations are so threadbare they cannot be credited as true at this juncture. Second, and more fundamentally, even if the allegations were true, they do not bear upon the elements of a claim under section 727(a)(5).[5] The Complaint fails to identify assets that the Defendant once had, but no longer has, and consequently fails to state a claim under section 727(a)(5). The Defendant is therefore entitled to judgment on the pleadings with respect to Count III.

**IV.     Count IV: Determination of Dischargeability Under 11 U.S.C. § 523(a)(6)**

Finally, in Count IV, the Plaintiffs allege that the Defendant's debt to them should be excepted from discharge under section 523(a)(6) as a debt "for willful and malicious injury to property of Plaintiffs, namely, the acts arising out of or related to a fraudulent construction project that deprived Plaintiffs of monies and property."

The Court recently granted a motion for judgment on the pleadings on a similar claim brought by a different pair of homeowners against this same defendant. See Page v. LaMantia

---

[5] Although these allegations could possibly have some bearing on the Defendant's entitlement to a discharge under 11 U.S.C. § 727(a)(4), the Plaintiffs have not put that statute in play.

- 16 -

(In re LaMantia), Adv. No. 19-1003, 2019 Bankr. LEXIS 3059, at *19 (Bankr. D. Me. Sept. 30, 2019). In Page, as in this case, the plaintiffs alleged that the Defendant lacked the skills necessary to undertake their construction project and later built a defective structure, leaving them without the benefit of their bargain. See id. at **17-18. The Court was unable to infer that the Defendant intended to injure the Pages because their theory of liability hinged solely on a form of reverse-engineered speculation about the state of the Defendant's mind. Id. at *18. The outcome in this proceeding is different than the outcome in Page because—as explained in more detail below—the Complaint here contains several allegations that suggest that the Defendant engaged in wrongful conduct that (a) gave rise to a debt to the Plaintiffs, and (b) was either intended, or substantially certain, to injure the Plaintiffs.

First, the Plaintiffs allege that the Defendant inflated the cost of certain materials by 90% or more, overcharging them for the resources used for their project. The invoices attached as exhibits to the Complaint support the Plaintiffs' theory. For example, the invoice that the Defendant gave the Plaintiffs shows a charge of more than $3,200 for the concrete footings and slab, but the invoice the Plaintiffs obtained from the concrete vendor shows that LCI paid the vendor less than $2,100.[6] Second, the Plaintiffs allege that the Defendant returned certain materials purchased for their job and pocketed a refund of more than $6,000, rather than crediting that sum to their invoice. Third, they allege that the Defendant converted certain materials provided by them for use on their project to his own uses. The Plaintiffs also allege that the Defendant decided to deviate from the architectural plans without engaging an engineer or obtaining architectural drawings, lied when he told them that he had the advice of an engineer

---

[6] The Defendant may have an explanation for this apparent discrepancy and for other discrepancies. But, at this juncture, the Court views the discrepancies in the light most favorable to the Plaintiffs and their legal theory.

and drawings in support of his decision, and then charged them for non-existent advice and drawings. The circumstances that the Plaintiffs describe render it reasonably likely that the Defendant, at some point in the chronology, possessed the actual intent to harm the Plaintiffs. In short, the Plaintiffs eke out a plausible claim that the Defendant engaged in the type of conduct to which section 523(a)(6) applies.[7]

## CONCLUSION

In this country, voluntary bankruptcy relief has always been reserved for the "honest but unfortunate" debtor. Local Loan Co. v. Hunt, 292 U.S. 234, 244 (1934); *see* George A. Bicknell, A Commentary on the Bankrupt Law of 1841: Showing its Operation and Effect 4 (reproduction from Harvard Law School Library) (Gould Banks 2d ed. 1842). Although the phrase itself does not appear in the Bankruptcy Code, the idea of limiting relief to the honest but unfortunate debtor is chief among the Code's animating principles. Bankruptcy almost always involves frustration of creditors' expectations. But dashed creditor expectations do not alone lead inexorably to the conclusion that a debtor has been dishonest. Here, the Plaintiffs have leveled accusations that, if proven, would establish that the Defendant was not aboveboard in his dealings with them. That type of conduct may insulate certain debts from a bankruptcy discharge or make the discharge unavailable. This case is different from Page because this case features allegations of conduct designed to thwart or harm the interests of the Plaintiffs. Those allegations are present here, and they were lacking in Page. That difference is significant and

---

[7] The Complaint asks for a determination of nondischargeability as to the "Debt." That term is not defined in the pleading, but the Court assumes that the Plaintiffs use the term to refer to the entire amount that the Defendant may owe them. The Complaint does not ask the Court to determine that amount; it only asks for a declaration regarding dischargeability. The Court's denial of the motion for judgment on the pleadings as to Count IV should not be equated with a signal that the Plaintiffs have articulated a plausible claim that the entire debt owed to them may fit within section 523(a)(6). It seems, based solely on the well-pleaded facts in the Complaint, that some portion of the debt may fit within that section.

justifies a different result, even though the defendant is the same in both cases and even though both sets of plaintiffs may have been harmed, to a significant extent, in ways that seem similar.

For the reasons set forth in this decision, the Defendant is entitled to judgment on the pleadings with respect to Counts II and III of the Complaint, but not as to Counts I or IV of the Complaint. A separate order will enter.

Date: October 18, 2019

Michael A. Fagone
United States Bankruptcy Judge
District of Maine