**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| In re:<br><br>Philip A. LaMantia,<br><br>              Debtor | Chapter 7<br>Case No. 18-10632 |
| Dane Rasmussen<br>& Brooke Miller,<br><br>              Plaintiffs<br><br>   v.<br><br>Philip A. LaMantia,<br><br>              Defendant | Adv. Proc. No. 19-1002 |

## MEMORANDUM OF DECISION

Dane Rasmussen and Brooke Miller hired Philip LaMantia to renovate their family home. Things quickly went awry, and the project ended badly. Now, after pursuing Mr. LaMantia in state court, Mr. Rasmussen and Ms. Miller have asked this Court to deny Mr. LaMantia's discharge or to determine that their claim against him is excepted from discharge. Although the complaint painted a dramatic picture of fraud and dishonesty from the inception of the parties' dealings, the evidence admitted at trial tells a different, but nevertheless unfortunate, story.

The evidence, on the whole, suggests that Mr. LaMantia did not initially intend to injure Mr. Rasmussen and Ms. Miller but quickly found himself in over his head. He underbid the job and then—cutting corners to keep costs down, lacking the required skills, or both—he experienced difficulties delivering a quality product in accordance with the parties' agreement. When the mismatch between the bid and reality became apparent, Mr. LaMantia affirmatively misrepresented certain costs and used those inflated costs to obtain additional payments from Mr. Rasmussen and

Ms. Miller. Although this conduct renders a portion of their claim nondischargeable, there is no

need to determine exactly what portion of the claim is excepted from discharge for one simple

reason: Mr. LaMantia is not entitled to a discharge of any debts in this case. When he learned of

the state court suit against him, he promptly emptied his bank accounts by making a series of cash

withdrawals. Mr. LaMantia then used the cash to prepay many months of living expenses, placing

that money beyond the reach of Mr. Rasmussen and Ms. Miller. These actions—undertaken on the

eve of a bankruptcy filing and with the specific intent to hinder and delay Mr. Rasmussen and Ms.

Miller in the exercise of their rights—renders Mr. LaMantia ineligible for the benefits of a

bankruptcy discharge.

## FINDINGS OF FACT

The following findings are based on the parties' stipulations [Dkt. No. 51] and the

evidence admitted at trial. Certain findings are also drawn from documents filed by Mr.

LaMantia (the "Defendant"), in his underlying chapter 7 case and in his prior chapter 13 case.

Before their dealings with the Defendant, Mr. Rasmussen and Ms. Miller (the

"Plaintiffs") hired an architect and paid him approximately $10,000 to render plans for the

renovation of their residence. The renovations were to include (i) the removal of a dilapidated

porch; (ii) the construction of a three-season heated porch, entry, and mudroom; (iii) the

construction of a fireproof vault in the basement below the porch; and (iv) the construction of

additional decking. The architectural plans specified use of Insulated Concrete Form ("ICF") to

construct the walls of the vault.[1] To achieve the Plaintiffs' desire for a fireproof vault ceiling and

radiant heat in the space above the vault, the plans called for a ceiling consisting of corrugated

metal supporting a thin layer of lightweight concrete topped with panels containing tubing for

---

[1] At trial, the architect explained that ICF is a mold, held together with rebar, into which concrete is poured. It offers both structural integrity and "R-value," a measure of insulation performance.

radiant heat.  When he issued the plans, the architect was aware of local contractors who worked

with ICF and knew that other local contractors frequently poured lightweight concrete.

The architect recommended two contractors, one of whom declined to bid.  The other bid

came in around $165,000, well above the $70,000 to $90,000 range the Plaintiffs were expecting.

The Plaintiffs were later referred, by another person, to the Defendant.

After a call from Mr. Rasmussen, the Defendant visited the Plaintiffs' home to discuss

the project on July 5, 2017.  In that conversation, the Defendant impressed Mr. Rasmussen with

his apparent knowledge of construction techniques.  They talked generally about the use of ICF

as specified in the plans, and the Defendant suggested extending the radiant heat from the

mudroom into the kitchen and bathroom.  During the meeting, the Defendant gave the Plaintiffs

a copy of a brochure that declared "Whatever your mind can conceive LaMantia Construction

will achieve."  With the brochure, the Defendant advertised "extensive combined construction

experience" including the ability to read blueprints and consult with architects on design.  The

brochure factored into the Plaintiffs' decision to contract with the Defendant.

Unbeknownst to the Plaintiffs, the pictures in the brochure were not images of projects

the Defendant had completed.  He chose them because they looked nice, and he did not tell the

Plaintiffs that the photographs were not depictions of his work, even though he understood they

might have that impression.

But not all was smoke and mirrors.  The Defendant does have training and experience in

the construction industry.  He began working on construction jobs while in high school and went

on to earn degrees in construction and low-voltage engineering.  In 2016, after relocating to

Maine, he started doing business as LaMantia Construction, Inc. ("LCI"), taking on residential

construction, remodeling, and renovation projects.  A year later, he incorporated the business.

Since its inception, LCI has completed more than 115 projects.  A number of the jobs have been relatively small, like the replacement of a window or a door.  At different times, the Defendant has run a crew of two to seven other people, paying them on an hourly basis and always in cash.

After their initial consultation, Mr. Rasmussen emailed the Defendant a digital copy of the architectural plans so that he could come up with a quote.  Two days later, the Defendant returned with a printed set of the plans and a quote.  When that quote was accepted by Mr. Rasmussen on July 7, 2017, it became the contract governing the parties' relationship.

The contract provided that LCI would take control of the project using the architectural plans as a "reference point."  In addition to the demolition and construction contemplated by the plans, the contract called for a wraparound deck "not in blueprints per customer request."  It specified bamboo flooring rather than the tile called for in the plans, plus the installation of new flooring in the bathroom and kitchen and new fixtures in the bathroom.  It also alluded to the potential demolition of a wall and the addition of French doors leading out on to the rear deck, and some other work in the existing basement, the price of which was to be determined.

Under the contract, labor and materials were to be furnished by LCI in exchange for a total sum of $82,500, to be paid on the following schedule: a first payment and deposit of $40,000 to cover equipment, dumpsters, some material, and waste removal; a second payment of $14,000 upon completion of demolition and waste removal and when the mudroom framing and concrete work for the vault were nearly complete; a third payment of $14,000 upon the commencement of work in the kitchen and bathroom; a fourth payment of $7,250 upon commencement of work in the basement; and a final payment of $7,250 upon completion of the project.  The contract indicated that if materials and other costs were less than anticipated, the amount of the final payment would be adjusted accordingly.  It also stated that the total price

might change depending upon increases in the price of materials, or upon the addition of extra work or the selection of high-end finish materials.[2]

The Plaintiffs made an initial payment of $40,000 to LCI upon execution of the contract. LCI then began working, demolishing the old porch and removing a set of stairs to prepare for the new construction. This aspect of the project went smoothly. After two weeks on the job, LCI began the groundwork for the vault. While working with an excavator, LCI cracked part of the septic line connecting the home to the septic system. With Mr. Rasmussen's approval, LCI hired a subcontractor to repair the line. The subcontractor determined that the entire line was in poor condition, found a crack in the septic tank, and recommended replacing the entire line and the tank. Mr. Rasmussen agreed with these recommendations and authorized the Defendant to oversee the work, which was not covered by the parties' contract.

The parties discussed the septic work on July 31, 2017, and the Defendant told the Plaintiffs that the improvements would cost about $20,000. That same day, the Defendant asked the Plaintiffs to write him a second check, outside of the schedule of payments established by the contract. The Defendant explained that he would need an advance on the next two scheduled payments because he had paid the septic subcontractor. He told the Plaintiffs that once the septic repairs were complete, the project would move quickly, and he needed to secure materials to make that happen. The Plaintiffs wrote a check to LCI in the amount of $28,000.

---

[2] At trial, there was a fair amount of testimony about whether the Plaintiffs wanted the Defendant to follow the plans to the letter or, instead, to follow them more loosely as a guide. The parties' testimony also repeatedly highlighted a dispute about whether their agreement had been a "fixed price contract." A characterization of the contract as either fixed price or variable is not germane to the claims asserted by the Plaintiffs. As for the parties' intentions with respect to the plans, those might assume greater significance in an action for breach of contract. Whether the plans were fully incorporated into the contract—or were more loosely utilized as a point of reference—has little bearing on whether the Defendant injured the Plaintiffs or their property with the requisite intent. The issue has no bearing on whether the Defendant should be denied a discharge under 11 U.S.C. § 727(a)(2)(A).

Around this time, differences arose between the parties regarding the radiant heat design in the architectural plans.  The Defendant told the Plaintiffs he did not think the ICF walls would be able to support the concrete ceiling.  He also told the Plaintiffs he could not find a contractor in the area willing to take on the liability of pouring the concrete ceiling in a residential structure. The Defendant did not contact the Plaintiffs' architect to discuss his concerns.  Instead, he told Mr. Rasmussen that he was consulting with an engineer who specialized in vault construction. He also said that he would need to modify the plans but would do so in a way that would make the finished product just as good, if not better.  He told the Plaintiffs that, on the advice of the engineer, he was going to add a center column to support a thicker ceiling and build the vault walls out of concrete blocks rather than ICF.  The Plaintiffs trusted the Defendant and relied on his expertise and the expertise of the alleged engineer.

Despite his assurances, the Defendant did not consult with an engineer on the Plaintiffs' project.  For reasons that remain unclear, the Defendant built the vault walls out of double rows of concrete blocks.

Toward the end of August, the Defendant gave the Plaintiffs an "Itemized Cost Report" representing that he had incurred total costs of $70,209.97 for the materials, labor, and equipment used to date.  The Defendant told the Plaintiffs he needed more money to keep the project moving, and the Plaintiffs made another payment to LCI in the amount of $14,500.  At this point, the Plaintiffs had paid the entire $82,500 contemplated by the contract; the Defendant had demolished the old porch, monitored the septic work, and built the vault floor and walls.

In September, agents for LCI poured the concrete ceiling for the vault.  The pour was very thick, messy, uneven, and domed on top.  It did not contain or otherwise incorporate the radiant heat tubing called for by the plans and the parties' contract.  After the pour, the

Defendant stopped coming to the job and the parties' relationship deteriorated. During a call

with Mr. Rasmussen, the Defendant said he would need an additional $57,000 to build the porch

and mudroom above the vault. He also stated, for the first time, that the Plaintiffs would need to

come up with another heating plan because radiant heat was not capable of heating the space.

The Defendant did not return to the job until mid-October. In the meantime, Mr.

Rasmussen measured the vault and determined that it was off from the plan specifications by a

couple of feet. He also noticed that water was seeping into the vault. When the Defendant

returned to the site, he observed that he needed to address the permeability problem. The

Plaintiffs asked the Defendant for vendor invoices and receipts substantiating the expenses listed

on the Itemized Cost Report. They did not receive any documents in response to their request.

In the absence of documentation from the Defendant, the Plaintiffs reached out to the

vendors themselves, and learned that three of the expenses listed on the Itemized Cost Report

had been inflated. First, the Defendant represented that he had incurred expenses of $9,101.99 to

transport and rent several dumpsters and remove approximately 80 metric tons of waste. The

supplier of the dumpsters later confirmed that the Defendant was charged only $3,119.75 for

approximately 60 tons of waste. This amount is $5,982.24 less than the Defendant told the

Plaintiffs he was charged. Second, the report listed an expense of $12,889.84 for certain

materials from Hammond Lumber Company. The Plaintiffs later received records from

Hammond Lumber showing that the Defendant was charged a total of $7,071.23 for materials

and was credited, or received cash refunds, totaling $3,050.19 for returned materials. These

records reflect charges of $8,868.80 less than the Defendant represented to the Plaintiffs in

writing. Third, the report listed an expense of $21,894 for the installation of a new septic

system, new pipe, a new septic tank, removal of the old equipment, and related landscaping. The

Plaintiffs later obtained records from the septic subcontractor showing that the Defendant was

billed a total of $12,074.44 for replacement of the sewer main and line, labor, new pipes, and

installation of the septic tank.  This figure is $9,819.56 less than the amount the Defendant told

the Plaintiffs he was charged.  When the amounts reflected on the Itemized Cost Report are

compared with the amounts substantiated by the vendors, the discrepancies total almost $25,000.

There were also other problems with the Itemized Cost Report.  For example, the report

itemized labor costs totaling $12,310, divided into three separate entries for a four-man crew, a

three-man crew, and a two-man crew.  The hourly rate apparently applicable to these various

crews is not constant, and there is no explanation for the variation.  The report also listed an

expense of $4,268.15 allegedly paid to the engineer who specialized in vault construction.  The

Plaintiffs never received any documentation showing that the Defendant actually consulted with

an engineer or paid any money to an engineer.  That consultation did not, in fact, occur.

In the fall of 2017, when the architect reached out to the Plaintiffs as a professional

courtesy, Mr. Rasmussen told him that the job had turned into a disaster and asked him to come

out to determine whether the Defendant's work could be salvaged.  After visiting the site, the

architect issued a letter deeming the Defendant's work unsatisfactory.  When describing that

work, the architect opined that it "deviates so significantly from the design relationships,

engineering, and code information contained in [the plans] that I have no other choice than to

recommend a complete demolition of all work performed to date, and to start over with the

project."  Later, the architect elaborated that the project was "some of the worst construction" he

had ever seen.  He explained that the vault walls were not plumb but were instead "sloping in a

way that was not consistent with any . . . standard of construction."

The Plaintiffs hired another contractor to demolish the vault built by the Defendant and pour a new foundation. That contractor described the Defendant's cement work as "excessive and non-conforming." He noted that the cement ceiling was not a flat surface but was instead "very wavy" on top and sagging underneath. He also observed that the vault floor had been approximately 12 inches thick, even though basement floors are ordinarily only 4 inches thick. He was unable to salvage any of the Defendant's work.

The Plaintiffs sued the Defendant in state court and obtained a prejudgment attachment against him and LCI on February 26, 2018 in the amount of $130,372. There was some delay in the issuance of the writs associated with the attachment. In the meantime, the Defendant learned about the state court suit on or about March 4. He immediately sought and retained counsel. The Defendant's attorney told him that if he filed for bankruptcy, the Plaintiffs' suit would "go away." His counsel also advised him to withdraw funds from his bank accounts to pay legal fees and living expenses.

On March 15, 2018, the Plaintiffs' attachment order was recorded in the registry of deeds. When the attachment order was served on the Defendant's financial institution on March 30, his accounts held only nominal sums. The following table reflects the dates and amounts of the Defendant's cash withdrawals and the balances remaining after those withdrawals:

| Account | Date | Cash Withdrawn | Balance After Withdrawals |
|---|---|---|---|
| Philip LaMantia (Savings) | March 6, 2018 | $3,000.00 | |
| | March 12, 2018 | $15,000.00 | |
| | March 16, 2018 | $33.00 | |
| | | | $1.30 |
| Philip LaMantia (d/b/a Antiques & Treasures) | March 16, 2018 | $25.00 | |
| | | | $0.62 |

| LCI – Business Account | March 12, 2018 | $1,000.00 | |
| | March 16, 2018 | $10,570.00 | |
| | | | $0.62 |
| Philip LaMantia (Joint with Minor Children) | March 16, 2018 | $2,019.48 | |
| | | | $0.00 |

Between March 6 and March 16, the Defendant withdrew in cash a total of $30,647.48 from these accounts, leaving each empty or nearly so.  With this cash, or some portion of it, he hired several different lawyers, made numerous car payments, filled both of his oil tanks, prepaid a year of his daughter's private school tuition in the approximate amount of $6,800, and filled his freezer.  The Defendant also used the cash to make nine or ten advance payments on his residential mortgage, totaling $4,900.

On May 1, 2018, the Defendant commenced a chapter 13 case.  On the schedules filed in that case, the Defendant stated that, as of May 1, he had only $2,000 in cash.  The Statement of Financial Affairs ("SOFA") filed in the chapter 13 case indicated that the Defendant had earned gross income of $141,085.87 from operating a business in 2017.

In 2014, several years before his dealings with the Plaintiffs, the Defendant and his spouse bought a home in Embden.  The settlement statement for that transaction shows that $89,500 of the purchase price was paid by a new loan, and reflects that funds were set aside for mortgage recording fees.  The registry of deeds shows that the deed to the Defendant and his spouse was recorded on December 16, 2014.  But, as of the chapter 13 filing in May 2018, there was no recorded mortgage in the registry as to the Embden property.  The schedules filed in the Defendant's chapter 13 case listed no secured creditors claiming an interest in his residence.  Those schedules did, however, list an unsecured debt of $82,500 owed to SGRF Corporation, a

company owned by the Defendant's uncle.  During the section 341 meeting, the Defendant stated

that he had a mortgage to his uncle's corporation.

Eight days after the Defendant's chapter 13 case was dismissed at his request, he and his

spouse signed a mortgage deed to SGRF in the amount of $105,000 bearing a date of March 10,

2015.  That deed was recorded in the registry on August 15, 2018, about two months before the

Defendant filed for chapter 7 on October 30, 2018.  The schedules filed in the chapter 7 case

listed SGRF as the holder of a secured claim in the amount of $82,500.  When asked in the

SOFA to list any transfers made as security within two years of the petition date—including the

grant of a mortgage—the Defendant did not list the mortgage granted to SGRF in August 2018.

The SOFA disclosed that the Defendant's gross income from operating a business in 2017

totaled $235,845, nearly $100,000 more than the gross business income for that same year

disclosed in the SOFA in the chapter 13 case.

## CONCLUSIONS OF LAW

### I.          Objection to Discharge Under 11 U.S.C. § 727(a)(2)(A)

The Plaintiffs object to the Defendant's receipt of a chapter 7 discharge, invoking the

following statute:

> (a) The court shall grant the debtor a discharge, unless —
>     . . .
>     (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer
>     of the estate charged with custody of property under this title, has transferred,
>     removed, destroyed, mutilated, or concealed, or has permitted to be
>     transferred, removed, destroyed, mutilated, or concealed—
>         (A) property of the debtor, within one year before the date of the filing of
>         the petition[.]

11 U.S.C. § 727(a)(2)(A).  This case does not involve removal, destruction, or mutilation, and

does not feature any hindrance, delay, or fraud perpetrated on an officer of the estate.  This

leaves the Plaintiffs with the burden of proving, by a preponderance of the evidence, that the

Defendant: (1) transferred or concealed property (2) that belonged to him (3) less than a year

before he began his chapter 7 case (4) with actual intent to hinder, delay, or defraud a creditor.

*See* Fed. R. Bankr. P. 4005 (assigning to the plaintiff the burden of proving an objection to

discharge); Cox v. Villani (In re Villani), 478 B.R. 51, 59 (B.A.P. 1st Cir. 2012) (articulating

preponderance of the evidence as the standard of proof applicable to a section 727(a)(2)(A)

claim); Marrama v. Citizens Bank of Mass. (In re Marrama), 445 F.3d 518, 522 (1st Cir. 2006)

(identifying the elements of a claim under section 727(a)(2)(A)).

As for the first element, the Bankruptcy Code defines the term "transfer" broadly to

mean, among other things, "each mode, direct or indirect, absolute or conditional, voluntary or

involuntary, of disposing of or parting with—(i) property; or (ii) an interest in property."  11

U.S.C. § 101(54)(D).  This definition "applies in the context of § 727[,]" Groman v. Watman (In

re Watman), 301 F.3d 3, 10 (1st Cir. 2002), and is "as broad as possible[,]" S. Rep. No. 95-989,

at 27 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5813.  "[A]ny transfer of an interest in

property is a transfer, including a transfer of possession, custody, or control even if there is no

transfer of title, because possession, custody, and control are interests in property.  A deposit in a

bank account or other similar account is a transfer."  Id.  By contrast, "concealment"—a term not

defined in the Code—has been interpreted to mean, among other things, the act of placing assets

beyond the reach of creditors.  *See* R.I. Depositors Econ. Prot. Corp. v. Hayes (In re Hayes), 229

B.R. 253, 259 (B.A.P. 1st Cir. 1999) ("Our decision turns on whether DEPCO proved a §

727(a)(2) act of concealment.  That is: Did the Hayes, within a year of bankruptcy, place assets

beyond the reach of creditors or withhold knowledge of assets by failing or refusing to divulge

information to which creditors were entitled?").  Here, the Defendant may have engaged in an

act of concealment by emptying his bank accounts in order to place those assets beyond the

Plaintiffs' reach.[3]  He may have also engaged in a transfer simply by withdrawing the funds,

thereby converting his claim against the bank into some other property interest.  Whether a

transfer or concealment occurred in either of these ways is a question that need not be answered.

A transfer undoubtedly occurred when the Defendant used the withdrawn funds for, among other

purposes, making multiple payments on his mortgage.

As for the second element, section 727(a)(2)(A) only applies if the Defendant transferred

(or concealed) property of his own.  *See* In re Watman, 301 F.3d at 7.  On first inspection, the

withdrawal of funds from LCI's account might appear to present some difficulties:  some of the

funds withdrawn from the bank accounts belonged to the Defendant personally, and other funds

were the property of LCI.  However, there is no suggestion that the Defendant segregated the

funds belonging to LCI and used them for purposes related to the business.  Instead, the

Defendant's own testimony indicates that he commingled the funds and used them to pay for

personal expenses and to make payments on his personal debts.  The Defendant treated all of the

funds withdrawn from the accounts as his own, including the funds that he withdrew from the

account titled in the name of the corporation of which he was the sole owner and CEO.  Based on

this apparent neglect of any corporate formalities with respect to the funds withdrawn from

LCI's account, the fact that those funds were once titled in LCI's name is unimportant.  By

withdrawing the funds and then using them to pay for personal debts and expenses, the

Defendant transferred his own property.

---

[3]  Although there is no direct evidence that the Defendant himself made the withdrawals in question,
that inference is amply supported by circumstantial evidence:  the accounts belonged to the Defendant or
his corporation, and the accounts were emptied after the Defendant learned of the Plaintiffs' suit against
him and obtained counsel who advised him to empty his bank accounts.  Further, despite extensive
examination on the subject at trial, the Defendant did not deny that he personally withdrew the funds.

There is no dispute about the third element.  The bank accounts were emptied less than a year before the Defendant began his chapter 7 case.[4]

The fourth element of the Plaintiffs' claim under section 727(a)(2)(A) requires proof that the Defendant engaged in the act of transfer or concealment "with actual intent to hinder, delay, or defraud a creditor."  In re Marrama, 445 F.3d at 522.  Although the Defendant claims innocent intent, that protestation conflicts with the circumstantial evidence indicating that he withdrew and then transferred the funds with the subjective intent to hinder the Plaintiffs' collection efforts.  *See* Mid-South Maint., Inc. v. Burk (In re Burk), 583 B.R. 655, 666 (Bankr. N.D. Miss. 2018) ("If a plaintiff provides circumstantial evidence of the debtor's intent, the debtor must offer more than an assertion of honest intent to overcome the implications of the circumstantial evidence.").  In this sense, this case is not unique.  Wrongful intent is almost never proved by direct evidence.  *See* In re Marrama, 445 F.3d at 522 (recognizing that "a debtor rarely gives direct evidence of fraudulent intent").  In most cases, a determination of intent turns on inferences drawn from circumstantial evidence.  Putnam Res. v. Pateman, 958 F.2d 448, 459 (1st Cir. 1992).  When evaluating the totality of the circumstances for evidence of fraudulent intent, courts consider the following factors:

> (1) insider relationships between the parties; (2) the retention of possession, benefit or use of the property in question; (3) the lack or inadequacy of consideration for the transfer; (4) the financial condition of the [debtor] both before and after the transaction at issue; (5) the existence or cumulative effect of the pattern or series of transactions or course of conduct after the incurring of the debt, onset of financial difficulties, or pendency or threat of suits by creditors; (6) the general chronology of the events and transactions under inquiry; and (7) an attempt by the debtor to keep the transfer a secret.

---

[4]   Within one year of the commencement of the chapter 7 case, the Defendant also recorded the mortgage to SGRF and transferred funds into his children's investment account.  But the Plaintiffs have not met their burden of proving that either of these transfers were undertaken with the intent to hinder, delay, or defraud a creditor.  The transfer into the children's investment accounts occurred *before* the Defendant learned of the Plaintiffs' suit against him.  And, it appears that the mortgage was recorded to correct an oversight that occurred at or after the closing.

In re Marrama, 445 F.3d at 522 (quotation marks omitted).  These same factors may also tend to show an intent to hinder or delay.  Annino, Draper & Moore, P.C. v. Lang (In re Lang), 246 B.R. 463, 469 (Bankr. D. Mass. 2000) *aff'd* 256 B.R. 539 (B.A.P. 1st Cir. 2000).

As one might expect, litigation under section 727(a)(2)(A) features a wide range of debtor behavior.  In this case, the Defendant emptied his bank accounts while in financial distress, days after learning of the Plaintiffs' state court suit against him, and less than two months before seeking protection in bankruptcy.  The Defendant did not empty one bank account.  Instead, he emptied several of them, and then used the withdrawn funds to file serial bankruptcy petitions and to make extra payments on his mortgage and prepay certain living expenses.  But a number of the factors identified in Marrama are not in play.  There was no evidence of a lack of consideration and no suggestion that the Defendant attempted to keep the transfers a secret.  Where, then, does this case fall in the section 727(a)(2)(A) continuum?

The Defendant's course of conduct is more egregious than the debtor's conduct in Delisle v. Staniunas (In re Delisle), Adv. No. 01-4391-JBR, 2003 WL 26085842 (B.A.P. 1st Cir. June 9, 2003).  In that case, Ms. Delisle was accused of transferring a truck within one year of her bankruptcy with the intent to hinder, delay, or defraud a creditor.  Ms. Delisle had transferred the truck in exchange for another vehicle and $9,000 in cash.  She failed to disclose the transfer on her petition.  The trial court determined that Ms. Delisle did not have an intent to hinder, delay, or defraud a creditor when she transferred the truck.  There was nothing suspicious about the timing, where the transfer occurred before the entry of default in state court litigation and nine months before Ms. Delisle filed her petition.  There was no evidence of inadequate consideration or of a transfer to an insider.  And, Ms. Delisle had lost her job one month before the transfer, giving rise to an inference that she sold the truck because she needed the funds to support her

family.  In these circumstances, the Bankruptcy Appellate Panel affirmed the trial court's finding

that the debtor did not intend to hinder, delay, or defraud any creditors when she sold the truck.

By contrast, the Defendant's conduct appears less egregious than that of the debtors in

other cases, some of which involve a transfer of real estate or other substantial assets or transfers

to close insiders or trusts for no consideration.  In Marrama, for example, the debtor was denied a

discharge under section 727(a)(2)(A) when, during a period of financial distress and impending

litigation, he: (i) refinanced his vacation home and transferred more than $100,000 of the

proceeds into his girlfriend's account for no consideration, retaining access to the money after

the transfer, and (ii) violated a state court order barring asset dissipation by transferring his

vacation home into a spendthrift trust of which his girlfriend was trustee and he the sole

beneficiary.  See 445 F.3d 518; cf. Warchol v. Barry (In re Barry), 451 B.R. 654 (B.A.P. 1st Cir.

2011) (affirming judgment denying Mr. Barry a discharge where, within one year of bankruptcy,

and while defending a state court action against him, the Barrys granted multiple mortgages on

their investment property then sold that property and paid off the mortgages while a creditor's

request for attachment was pending).

Villani serves as another example of egregious debtor behavior.  See 478 B.R. 51.  In that

case, the debtor was denied a discharge when, after the entry of a preliminary injunction against

him, the debtor (i) deposited $85,000 in proceeds from the sale of his boat into the payroll

account of his business, then transferred those funds to reduce the first mortgage on his

residence, (ii) deposited $21,720 in proceeds from an insurance settlement into the business

payroll account, then transferred most of those funds to reduce his first mortgage, and (iii)

withdrew $36,892 from his retirement account and deposited the funds into the account of his

bookkeeper and girlfriend.  The debtor testified that—based on his consultations with counsel—

he did not think the injunction precluded the sale of his personal assets, and he believed that his

retirement account was not subject to attachment.  The Bankruptcy Appellate Panel rebuffed the

debtor's attempts to negate the inference of improper intent.  When the debtor asserted that he

had used the funds to pay legitimate debts, the Panel rejected the argument, concluding that "'a

debtor may not act to prefer one creditor with the specific intent to delay impermissibly another

creditor.'"  Id. at 61 (quoting In re Barry, 451 B.R. at 662).  The debtor's reliance-on-counsel

defense was likewise unavailing.  "Generally speaking, a debtor may not escape the

consequences of acting in violation of the Bankruptcy Code by pleading ignorance and pointing

the finger at former . . . counsel as the bearer of bad advice."  Id. (quotation marks omitted).[5]

     This case is closer to Villani than Delisle.  Although the debtor's conduct in Villani was

more egregious than that at issue here—where it was undertaken after the entry of a preliminary

injunction, not merely upon notice of pending state court litigation—the use of property

potentially subject to attachment to pay down a mortgage, without any suggestion that the

mortgagee was considering foreclosing, is similar.  Here, two facts especially militate in favor of

a determination that the Defendant engaged in a transfer with the intent to hinder the Plaintiffs'

collection efforts.  First, the general chronology is highly suggestive of an improper intent.  The

Defendant withdrew nearly all of his assets, from multiple accounts, within a matter of days after

learning of the Plaintiffs' suit against him.  In the absence of any other explanation, it certainly

appears—despite his testimony to the contrary—that he knew that the funds might be attached by

the Plaintiffs.  Less than two months later, he filed the first of his successive petitions for relief

under the Bankruptcy Code, after being advised that the Plaintiffs' suit would "go away" if he

---

[5]  A debtor's reliance on the advice of counsel in undertaking a particular course of conduct should be considered when evaluating the debtor's intentions vis-à-vis that conduct.  Such reliance does not, however, immunize the debtor from a finding of fraudulent intent in all circumstances.  Rather, reliance on the advice of counsel is one piece of the puzzle that must be viewed along with all of the other pieces.

pursued bankruptcy.  Second, the Defendant's use of a portion of the funds to prepay nearly ten months of payments to his mortgagee—a corporation owned by his uncle—was far from an ordinary course transaction.  The Defendant offered no explanation for his decision to make these substantial advances on his regularly scheduled mortgage payments.  But, as to the Plaintiffs, the consequences of that transaction are clear: they were unable to attach the funds. Under the circumstances, the Court infers that the accelerated payments were made with the subjective intent of making the funds unavailable to the Plaintiffs.  When that transaction is considered in the context of the general chronology and the Defendant's difficulty explaining how he spent the remaining funds, the Court is left with the firm conviction that the Defendant engaged in a transfer with the intent to hinder the Plaintiffs.

At trial, the Defendant testified that when he withdrew the funds from his bank accounts, he did not intend to hinder, delay, or defraud any creditors.  He explained that he withdrew the funds on the advice of counsel.  He also claimed that his attorney did not tell him that his accounts could be attached.  This particular claim—that the Defendant was unaware that the bank accounts might be seized—is not plausible in the first instance.

Further, the Defendant's claims of innocent intent are undermined by his general lack of credibility.  Although he accounted for some of the funds, he failed to explain how he disposed of the $30,000 withdrawn from his accounts in early to mid-March of 2018 and spent that sum down to the $2,000 in cash that he disclosed on his chapter 13 schedules in early May.  The Defendant's inability to account for a significant portion of the cash bolsters the conclusion that there was an effort to conceal the funds.  At various points in the trial, the Defendant's description of his dealings with others bordered on fantastic; at other times, he appeared to engage in various forms of confusing, revisionist history to provide cover for his apparent

overbilling of the Plaintiffs and his unsuccessful construction efforts.  For example, the

Defendant claimed that Mr. Rasmussen had asked for a thicker vault than that specified in the

plans during their initial consultation because he was worried about the security of his collection

of explosives and the proximity of that collection to members of his family.  Mr. Rasmussen

convincingly denied having any such collection or asking for any such deviation to the plans.

Later in the trial, the Defendant testified that, with Mr. Rasmussen's assent, he had paid the

septic subcontractor $9,000 in cash to convince that subcontractor to attend to the Plaintiffs'

issues promptly.  Mr. Rasmussen denied any knowledge of this payment and it is unlikely such a

transaction occurred at least in part because the record contains written invoices from the septic

contractor that do not reveal a large cash payment made in order to expedite the work.  What

seems substantially more likely is that the Defendant fabricated this story to account for the

roughly $9,000 discrepancy between the septic charges he listed on the Itemized Cost Report and

the amounts that the contractor later reported billing him.  The Defendant's other attempts to

counter the discrepancies between items reflected on the Itemized Cost Report and the charges

reported by various vendors were confused and unconvincing.  His testimony about the engineer

who allegedly specialized in vault construction was also incredible.  The Defendant claimed that

he met the engineer in the parking lot of a hardware store and consulted with him over the course

of four to five days, including during a site visit.  The Defendant also said that Mr. Rasmussen

spoke with the engineer on the phone, and that he gave Mr. Rasmussen the engineer's card.  The

Defendant could not, however, remember the engineer's name or the name of his company, even

though he had no difficulty remembering, in detail, various conversations that occurred during

that same timeframe.  For his part, Mr. Rasmussen convincingly denied ever speaking with the

engineer or receiving his business card.  The Defendant also neglected to show much concern for

the accuracy of the documents that he signed and filed in his bankruptcy cases, failing to provide

any credible explanation for the significant discrepancy between the income for 2017 reported on

the SOFA in his chapter 13 case and the income for 2017 reported on the SOFA in his chapter 7

case.  The net result of the gaps in the Defendant's memory, his implausible and fantastic claims,

and the discrepancies in the documents signed under oath and filed in his bankruptcy cases is a

serious question about the Defendant's credibility.

When the Defendant's self-serving testimony concerning his intent vis-à-vis the funds

withdrawn from his accounts and then spent is contrasted with the circumstantial evidence

suggestive of an improper intent, the circumstantial evidence carries the day.  Because he

transferred his property, within one year of the petition date, with the subjective intent to hinder

or delay the Plaintiffs' collection efforts, the Defendant is ineligible for a discharge under section

727(a)(2)(A).

## II.        Request to Determine Dischargeability Under 11 U.S.C. § 523(a)(6)

The Plaintiffs assert that even if the Defendant were entitled to a discharge generally,

their claim against him should be excepted from discharge.  They specifically invoke section

523(a)(6), which provides that a chapter 7 discharge "does not discharge an individual debtor

from any debt . . . for willful and malicious injury by the debtor to another entity or to the

property of another entity."  11 U.S.C. § 523(a)(6).  According to the Plaintiffs, their entire claim

against the Defendant falls within the confines of section 523(a)(6) because the Defendant lacked

the skills needed, and never actually intended, to build the structure he was hired to build.  To

support this theory, the Plaintiffs point to the expert testimony of the architect and the contractor

who demolished the Defendant's work, both of whom condemned the quality of that work in no

uncertain terms.  This form of speculation about the state of the Defendant's mind, reverse-

engineered from the final product, is not enough to move the needle regarding the Defendant's

intent at the outset of his dealings with the Plaintiffs, even when coupled with the Defendant's

misleading brochure.

On the whole, the Plaintiffs' nondischargeability theory was not borne out by the

evidence at trial. Mr. Rasmussen's testimony about his role in the project was not entirely

convincing and left the impression that part of the story remained untold. He said that he never

asked for any deviations to the architectural plans even though the parties' contract contemplated

work not called for in the plans. He also claimed that he did not approve of any of the

Defendant's modifications to the planned structure. That Mr. Rasmussen would not have

approved of the substantial changes to the vault design undertaken by the Defendant is hard to

believe; he must have noticed the construction did not conform to the plans and cannot have

reasonably remained silent given such notice. Yet there was no evidence of any protest by the

Plaintiffs to the obvious deviations from their plans. Even less believable was Mr. Rasmussen's

testimony that the Defendant agreed to absorb the expense of replacing the entire septic line and

the septic tank. Mr. Rasmussen acknowledged that the problems requiring this wholesale

replacement were not caused by the Defendant and said he had been surprised when the

Defendant agreed to bear the cost. That the Defendant would have made that agreement defies

common sense; the estimated cost of the work was nearly 25% of the full contract price.

The Court is not persuaded that the Defendant intended to injure the Plaintiffs or their

property when he executed the contract. He may have underestimated the project in more ways

than one. But the Plaintiffs have not shown that he maintained ill will toward them from the

outset. Instead, the picture that emerged was that of a contractor who hastily constructed a bid

and, in so doing, bit off more than he could chew. Based on the Defendant's testimony about

LCI's history and the size and number of its previous jobs, and the speed with which he

generated a quote, the Court infers that this project was particularly appealing to the Defendant

because it was relatively large, and he needed the work.  The Defendant did not secure the first

payment and skip town.  Instead, he completed the demolition to the Plaintiffs' satisfaction, and

all went smoothly until the septic issues arose.  The aspect of the septic problems attributable to

the Defendant—the initial damage to the septic line—was caused by mistake, or simple

negligence at most.  There was no suggestion to the contrary.  Weeks in, when the Defendant

realized that he had underbid the job and would need to convince the Plaintiffs to part with more

money than he had represented the project would cost, he overcharged them for certain materials

and fabricated various stories—including the engineer who specialized in vault construction—to

convince them that it was necessary to build something different than they had envisioned.

Later, when the defects in the vault became apparent, he walked away from the problem.  This is

a homeowner's nightmare.  But the sympathy that might be engendered by the story overall does

not render the Plaintiffs' entire claim against the Defendant nondischargeable.

Some part of that claim is nondischargeable under section 523(a)(6).  The portion of the

claim arising out of the Defendant's misrepresentations regarding the cost of materials and other

project inputs, including the engineer, qualifies as a debt "for willful and malicious injury by the

debtor to . . . the property of another entity[.]"  11 U.S.C. § 523(a)(6).  *See generally* Old

Republic Nat'l Title Ins. Co. v. Levasseur (In re Levasseur), 737 F.3d 814 (1st Cir. 2013); Printy

v. Dean Witter Reynolds, 110 F.3d 853 (1st Cir. 1997).  However, the Court will not determine

the amount of the Plaintiffs' claim that is nondischargeable because the Defendant is not entitled

to discharge any of the Plaintiffs' claim (or any other claim against him arising before the

commencement of his chapter 7 case).  As a result, a determination of dischargeability would not

benefit the Plaintiffs in this case or in any subsequent chapter 7 case.  *See* 11 U.S.C. § 523(a)(10)

(barring discharge of debts that were or could have been scheduled in a prior case in which

debtor was denied a discharge under section 727(a)(2)); *see also* 11 U.S.C. § 727(b) (providing

that a discharge under section 727(a) discharges the debtor from all debts that arose prior to the

date of the order for relief, "[e]xcept as provided in section 523").  In their post-trial submission,

the Plaintiffs appeared to recognize this reality, asking for a determination of nondischargeability

*if* the Court concluded that the Defendant was entitled to a discharge generally.

## CONCLUSION

Denial of a discharge is a serious sanction, one that must not be imposed lightly.  *See*

Boroff v. Tully (In re Tully), 818 F.2d 106, 110 (1st Cir. 1987) ("[T]he statutory right to a

discharge should ordinarily be construed liberally in favor of the debtor.").  That said, the

elimination of most types of debts in a case under Title 11 is a significant benefit, and one that

has always been reserved for the "honest but unfortunate" debtor.  *See* Cohen v. de la Cruz, 523

U.S. 213, 217 (1998) (indicating that the Bankruptcy Code is animated by a policy of "affording

relief only to an honest but unfortunate debtor") (quotation marks omitted).  When faced with

creditor activity (such as a levy on bank accounts), a debtor is not required to sit by idly and

allow the creditor to seize all assets needed by the debtor and his dependents.  There is a strong

public policy in favor of allowing debtors to retain enough in the way of assets to support

themselves and their dependents.  That policy is reflected in the law of exemptions.  But, just as

some pre-bankruptcy exemption planning is permissible and some may lead to a denial of

discharge, emptying bank accounts and using the resulting cash to prepay living expenses may

be permissible, but only up to a point.  Here, the Defendant went too far, forfeiting the ability to

present himself as an "honest but unfortunate" debtor and instead demonstrating behavior

consistent with a pattern of playing "fast and loose" with his assets and the reality of his financial

affairs. *See* Razzaboni v. Schifano (In re Schifano), 378 F.3d 60, 66 (1st Cir. 2004) ("[T]he very

purpose of certain sections of the law, like [§ 727(a)(2)], is to make certain that those who seek

the shelter of the bankruptcy code do not play fast and loose with their assets or with the reality

of their affairs.") (quotation marks omitted).

The Defendant will be denied a chapter 7 discharge under 11 U.S.C. § 727(a)(2)(A).  A

separate judgment will issue.


Date:    October 9, 2020

_____
Michael A. Fagone
United States Bankruptcy Judge
District of Maine

- 24 -